503 So.2d 1149 (1987)
John Keith BRITTEN, et al., Plaintiffs,
v.
Roy REAVIS, Sunrise Industries, Inc., Floyd A. Hurt, Rodco Worldwide, and Penn-America Insurance Company, Defendants and Third-Party Plaintiffs-Appellants,
v.
A.I. CREDIT CORPORATION, Third-Party Defendant-Appellee.
No. 86-760.
Court of Appeal of Louisiana, Third Circuit.
March 4, 1987.
Rehearing Denied March 31, 1987.
Writ Denied May 29, 1987.
*1150 Richard A. Chopin and Thomas M. Richard, Baton Rouge, for Reavis, et al.
Beard and Artigue, Caliste Beard, Jr. and Michael Artigue, Lafayette, for Britten.
Leo J. Lahey, Lafayette, for Guilliot, Skinner, etc., Paul J. Guilliot, Lafayette, Camp, Carmouche, Gregg L. Spyrido and Donald Hoffman, New Orleans, for A.I. Credit Corp.
Before DOUCET and YELVERTON, JJ., and CULPEPPER[*], J. Ad Hoc.
YELVERTON, Judge.
The sole issue raised by this appeal is whether the trial court erred in granting Penn-America Insurance Company's motion for summary judgment by finding from the undisputed facts that a policy of insurance was not in effect on January 6, 1984. We find error; we reverse the summary judgment; and we remand for further proceedings.
The essential facts are as follows. The policy, called a "Business Auto Policy", was written by Penn-America Insurance Company covering several vehicles and insuring Sunrise Industries, Inc. The policy period was from August 21, 1983, to August 21, 1984. The annual premiums for this and other coverages came to $11,169. Penn-America was paid these premiums. A.I. Credit Corporation (AICCO), a New York premium finance company, financed the premiums, requiring a down payment from Sunrise of a little over $4,000 and financing the balance in eight equal monthly payments of $938.14, beginning October 21, 1983.
From the start Sunrise was slow in making its monthly payments to AICCO, making the first payment in November 1983, the second payment by January 4, 1984, and the third (December 1983) payment on January 10, 1984.
In the premium finance agreement Sunrise gave AICCO a power of attorney to cancel the policy for non-payment of premiums. This was AICCO's security to enable it to recover unearned premiums from the insurer in the event Sunrise defaulted under the finance agreement.
On December 23, 1983, the payment for November being overdue, AICCO mailed a notice of cancellation to Sunrise, declaring the cancellation effective two days later on December 25. A copy of this notice was also sent to Penn-America and the insurance agent. Sunrise supposedly did not receive this notice until after January 6, 1984. AICCO got a payment on or before January 4, 1984, and the next day, January 5, it wrote Sunrise saying the account remained cancelled and that the payment just received was applied to the cancelled account. Sunrise continued to send premium payments to AICCO through March 1984 and AICCO continued to credit these payments to the account.
An accident involving one of the insured vehicles took place on January 6, 1984. Sunrise immediately notified the insurance agent.
This accident gave rise to a lawsuit from which the present two consolidated appeals have been taken. John Britten filed suit individually and on behalf of his two minor children seeking damages for the wrongful death of his wife Jeanne Britten and for personal injuries sustained by himself. Penn-America was one of the defendants.
Penn-America answered denying liability on the ground that the policy of insurance issued to Sunrise had been effectively cancelled by the insured's agent before the date of the accident. At the same time, Penn-America filed a third party demand against AICCO alternatively alleging liability on the part of AICCO for ineffective cancellation of the policy, should it turn out that the policy had not been effectively cancelled.
The parties then filed summary judgment motions. Plaintiffs moved for a summary judgment ruling that the Penn-America policy was in effect on the day of the *1151 accident. Penn-America filed its own motion for summary judgment contending the policy had been effectively cancelled by AICCO prior to the accident, and in the alternative sought summary judgment against AICCO for the "wrongful cancellation" of the insurance. AICCO also filed a motion for summary judgment seeking a dismissal of Penn-America's third party demand on the ground that LSA-R.S. 9:3550 imposes no liability on the part of a premium finance company for "wrongful cancellation" of a policy.
The trial court ultimately granted Penn-America a summary judgment dismissing it from plaintiffs' suit. Plaintiffs appealed (our docket number 86-760). The trial court later granted AICCO summary judgment dismissing it from Penn-America's third party demand, and Penn-America appealed (our docket number 86-326). These two appeals were subsequently consolidated. However, a separate opinion will today be rendered in docket number 86-326 entitled Britten v. Reavis, 503 So.2d 1155 (La. App. 3rd Cir.1987).
Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits and other exhibits show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La.C.C.P. art. 966.
In the present case numerous documents, letters, and affidavits were filed by each of the parties in support of their motions for summary judgment. There is no dispute as to the above narrated facts that form part of this summary judgment evidence.
The trial court concluded based on these facts that as a matter of law AICCO, exercising its power of attorney from Sunrise, cancelled the policy effective January 2, 1984 (10 days after its notice of cancellation was mailed). Penn-America was accordingly dismissed from the suit on the holding that the policy was not in effect on the day of the accident, January 6.
The trial court based its summary judgment on LSA-R.S. 9:3550, dealing with cancellation of insurance contracts by insurance premium finance companies.
At the time of the accident in this case that statute in pertinent part read as follows:
"§ 3550. Insurance premium finance companies
"A. This Section shall apply to any person engaged in the business of financing insurance premiums, entering into premium finance agreements or otherwise acquiring premium finance agreements.
"B. For the purposes of this Section:
(1) "Insurance premium finance company" means a person engaged in the business of entering into premium finance agreements;
(2) "Premium finance agreement" means an agreement by which an insured or prospective insured promises to pay to an insurance premium finance company the amount advanced or to be advanced under the agreement to an insurer or to an insurance agent or broker in payment of premiums on an insurance contract together with a service charge as authorized and limited by this Section;
(3) "License" means an insurance premium finance company holding a license issued under this Section;
(4) "Person" includes an individual, partnership, association, business corporation, nonprofit corporation, common law trust, joint-stock company or any other group of individuals however organized.
"C. No person shall engage in the business of financing insurance premiums in this state without first having obtained a license as an insurance premium finance company from the commissioner except as provided in Subsection (A) hereof. The annual license fee shall be in accordance with R.S. 9:3564(D).
* * * * * *
"G. Insurance contracts may be cancelled upon default as follows:
(1) When a premium finance agreement contains a power of attorney enabling the insurance premium finance company to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be cancelled by the insurance premium finance company unless such cancellation is effectuated in accordance with this Subsection.
(2) Upon default of insurance premium contract by the debtor, the premium finance company may mail a notice of cancellation to the insured, at his last known address as shown on the records of the insurance premium finance company. A copy of the notice of cancellation of the insurance contract shall also be mailed to the insurance agent negotiating the related insurance contract whose name and place of business appears on the premium *1152 finance agreement. Such notice of cancellation shall show the name of any governmental agency, mortgagee or third party also requiring notice of cancellation as shown on the insurance premium finance contract.
(3) Ten days after notice of cancellation has been mailed to the insured, if the default has not been cured, the insurance premium finance company may thereafter effect cancellation of such insurance contract or contracts by mailing to the insurer a copy of the notice of cancellation together with a statement certifying that:
(a) The premium finance agreement contains a valid power of attorney as provided in paragraph (1) above;
(b) The premium finance agreement is in default and the default has not been timely cured;
(c) Upon default, a notice of cancellation was mailed to the insured as provided in paragraph (2) above, specifying the date of mailing by the premium finance company to the insured; and
(d) Copies of the notice of cancellation were mailed to all persons shown by the premium finance agreement to have an interest in any loss which may occur thereunder, specifying the names and addresses of any governmental agencies, mortgagees or third parties to whom the insurance premium finance company has sent notice of cancellation.
"Upon receipt of such notice of cancellation and statement from the premium finance company, the insurer shall be entitled to consider that cancellation of the insurance contract or contracts has been requested by the insured but without requiring the return of the insurance contract or contracts and the insurer may proceed to cancel such contract or contracts as provided in R.S. 22:637. The effective date of cancellation shall be as of 12:01 A.M. on the tenth day after the date of mailing of the notice of cancellation as shown in said statement furnished to the insurer by the premium finance company.
"The receipt of such notice and statement by the insurer shall create a conclusive presumption that the facts stated in said notice and statement are correct, that the insurer is entitled to rely on such facts and that the cancellation of the insurance contract or contracts is concurred in and authorized by the insured. No liability of any nature whatsoever either in favor of the insured, any governmental agency, mortgagee or third party shall be imposed upon the insurer as a result of any misstatement of fact contained in said notice of cancellation or statement furnished by the insurance premium finance company to the insurer, or as result of failure by the insured, any governmental agency, mortgagee or third party to receive the notice of cancellation required by paragraph (2) above, or as a result of failure of the insurance premium finance company to comply with any of the requirements of this Subsection. Upon mailing of any unearned premium to the insurance premium finance company as soon as practicable following such cancellation, the insurer shall be fully discharged from all liability under the insurance contract or contracts for any loss occurring subsequent to the effective date of cancellation.
(4) Upon receipt of the notice of cancellation, the insurer shall give notice to any other governmental agency, mortgagee, or other third party as shown in the records of the insurer requiring statutory, regulation or contractual notice and which were not given by the premium finance company as provided in (3) above. The insurer shall give the prescribed notice on behalf of itself or the insured to any governmental agency, mortgagee, or third party on or before the fifth business day after the day it receives a copy of the notice of cancellation from the insurance premium finance company and shall determine the effective date of cancellation taking into consideration the number of days notice required to complete the cancellation if such notice is given by the insurer, otherwise the effective date of cancellation shall be calculated from the date the premium finance company mailed the notice to such governmental agency, mortgagee, or other third party taking into consideration the number of days notice required to complete the cancellation.
"H. Whenever a financed insurance contract is cancelled, the insurer shall return whatever gross unearned premiums, less any unearned commissions due the insurer, are due under the insurance contract to the insurance premium finance company for the account of the insured or insureds as soon as reasonably possible but in no event shall the *1153 period for payment exceed sixty days after the effective date of cancellation. In the event that the crediting of return premiums to the account of the insured results in a surplus over the amount due from the insured, the insurance premium finance company shall refund such excess to the insured provided that no such refund shall be required if it amounts to less than one dollar."
The trial court ruled that R.S. 9:3550 applies to the present situation even though the evidence did not show AICCO was licensed as required by Subsection (C) of that statute. We agree.
Paragraph (C) states that no person shall engage in the business of financing insurance premiums in this state "without first having obtained a license ... except as provided in Subsection (A) hereof." Subsection (A) states without qualification that the entire statute applies to any person engaged in the business of financing insurance premiums. Thus, even though a person or business fails to obtain a license as required by Subsection (C), Subsection (A) makes the remaining provisions dealing with insurance premium finance companies nevertheless applicable. We note additionally that the subsection dealing with the requirements for the cancellation of insurance contracts does not provide that only an insurance premium finance company holding a license issued under R.S. 9:3550 is capable of cancelling a policy. We conclude that the failure to obtain a license, while perhaps a technical violation, does not exempt AICCO from being subject to the remaining provisions of R.S. 9:3550, nor from availing itself of the benefits of the statute.
The essential question in the case is whether there was an effective cancellation of the insurance contract upon default. Subsection (G) sets up a procedure in mandatory language for the effective cancellation of an insurance contract by an insurance premium finance company using a power of attorney, stating "the insurance contract or contracts shall not be cancelled by the insurance premium finance company unless such cancellation is effectuated in accordance with this Subsection." The procedure is:
First, the premium finance agreement must contain a power of attorney enabling the insurance premium finance company to cancel the insurance contract. In the present case the agreement contained that provision.
Second, upon default by the debtor, the premium finance company must mail a notice of cancellation to the insured and the insurance agent. This requirement was also met.
Third, ten days after the notice of cancellation has been mailed to the insured, if the default has not been cured, the insurance premium finance company "may thereafter effect cancellation" of the contract by mailing to the insurer a copy of the notice of cancellation and a statement certifying the following facts: (1) the agreement contained a valid power of attorney, (2) the agreement is in default and has not been timely cured, (3) the notice of cancellation was mailed to the insured, and (4) copies of the notice of cancellation were mailed to all other persons shown by the agreement to have an interest.
In the present case the exhibits filed with the motions for summary judgment do not reveal that these latter requirements were met. The record does not show that any notice of cancellation with a certified statement was mailed ten days after AICCO sent out its notice of cancellation. The record reveals only that the insurer was sent a copy of the notice of cancellation presumably on the same day the insured was sent his copy.
Merely sending the notice of cancellation to the insured and insurer does not effectively cancel the policy. Only after the insured has been given a minimum of ten days to cure the default, and does not, may the finance company thereafter effect cancellation through its power of attorney.
The insurer is entitled to consider that cancellation has been requested by the insured only upon receipt of both the notice of cancellation and "the statement from the premium finance company." Subsection (G)(3). The sending of a copy of the notice of cancellation without the attached statement merely suggests that the premium finance company has sent the notice of cancellation to the insured but that it has not yet exercised its option to cancel the policy under its power of attorney. The finance company does not have to effect cancellation. It may elect to wait and allow its debtor to cure the default. The insurer has no interest in the matter because the insurer has been paid its premium in full.
Strict adherence to the statutory procedure for exercising the power of attorney and effecting cancellation of a policy *1154 by a finance company is necessary because that is the only way the effective date of cancellation can be accurately determined. The present case illustrates the uncertainty that results from a failure to follow the statutory procedure. For example, in support of its motion for summary judgment in the district court, Penn-America argued that the effective cancellation was 12:01 A.M. on December 25, 1983. Supporting that argument Penn-America reasoned that since AICCO had mailed a notice to the insured on December 2, 1983, saying that it would cancel the policy if the November 21 payment was not made, its December 23 notice of cancellation that came after 10 days had passed gave notice to both the insured and the insurer that the policy was being cancelled, and fixed the effective date as December 25. That argument of Penn-America was not adopted by the trial court. Although the trial court ruled that the policy was cancelled, the trial court, applying R.S. 9:3550((G), found the effective date of cancellation was 12:01 A.M. January 2, 1984, which was 10 days after December 23, the date of mailing of the notice of cancellation. Penn-America adopted the trial court's reasoning and that date in its brief before this court on appeal. However, during oral arguments before this court, Penn-America once more took the position that it was the notice of intent to cancel AICCO mailed on December 2, 1983, that triggered the 10-day period for curing the default and that the notice of cancellation mailed on December 23 effected the cancellation on December 25. Had AICCO complied strictly with the provisions of the statute for effecting cancellation, there would be no difficulty in accurately calculating the exact date and time of cancellation.
It appears that this rather detailed and technical statutory method of effecting cancellation of a policy by a finance company serves two functions: (1) it provides a clear method of fixing the exact time and date of cancellation, and (2) it grants a minimum time during which the default may be cured. We interpret the statute to mean that a default can be cured by timely payment, and we interpret timely to mean a payment made anytime after notice of cancellation and before cancellation is effected by the finance company.
We have determined that the summary judgment evidence does not disclose that the requirements of the statute were met for effecting cancellation, and therefore it cannot be concluded that AICCO effectively cancelled the policy before the accident date of January 6. We find, additionally, based on the evidence in the record, that summary judgment was in error for the reason that the default may have been cured. To explain this, we need to set forth certain additional facts.
The attempted cancellation was for a default of the November 21 payment. Sunrise's check dated December 16 was deposited in AICCO's New York bank on January 4, 1984. The date that it was received and applied to the account of the finance company is unknown. But it was received and applied to the account before January 5, because that is the date of AICCO's letter acknowledging that "recent" receipt. In the meantime, AICCO had not effected cancellation (according to the summary judgment evidence). We interpret Subsection (G)(3) to mean that the finance company cannot effect cancellation until 10 days after notice of cancellation has been mailed, because this is the minimum time the statute allows the insured to cure the default. It stands to reason that if the finance company waits more than 10 days before attempting to effect cancellation, it thereby extends the time equivalently for the insured to cure the default, because among the certifications it must make to the insurer is the certification that the premium finance agreement is in default and that the default has not been timely cured. Subsection (G)(3)(b). If before it sends the certification it receives and accepts the late payment, the finance company can no longer certify that the default has not been cured, and at this point, there is no way that the finance company can effect cancellation based on that default and that notice of cancellation. In our view, these summary judgment facts considered in the light of the statute do not show that AICCO effected cancellation of the policy before the accident date of January 6, 1984. If it did comply with the statute in a manner to effect cancellation after ten days but before receipt of payment, the evidence of that compliance is not in the record. On this record, summary judgment declaring the policy was not in effect on the day of the accident, January 6, 1984, was erroneously granted. The judgment is reversed and the case is remanded. AICCO and Penn-America will pay the costs of this appeal equally.
REVERSED AND REMANDED.
NOTES
[*] Judge William A. Culpepper, Retired, Judge Ad Hoc.